REISSUED FOR PUBLICATION

MAR 30 2022

OSM

U.S. COURT OF FEDERAL CLAIMS

# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: March 30, 2022

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
W.J., by his parents and legal guardians,      *
R.J. and A.J.,                                 *      UNPUBLISHED
                                               *
                Petitioners,                   *      No. 21-1342V
                                               *
v.                                             *      Special Master Nora Beth Dorsey
                                               *
SECRETARY OF HEALTH                            *      Dismissal Decision; Measles, Mumps,
AND HUMAN SERVICES,                            *      and Rubella ("MMR") Vaccine;
                                               *      Encephalopathy; Statute of Limitations;
                Respondent.                    *      Equitable Tolling.
                                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

R.J. and A.J., pro se, Staten Island, NY, for petitioners.
Sarah B. Rifkin, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

## I.       INTRODUCTION

On May 7, 2021, R.J. and A.J. ("petitioners") filed a petition, on behalf of their minor child, W.J., pursuant to the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[2]  Petitioners generally allege that their minor child, W.J., suffered from a chronic encephalopathy Table claim and/or a cause-in-fact or significant aggravation of pre-existing cerebral and immunological damage, including immune-

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

related blood disorders, severe eczema, and many other allergies as a result of a measles, mumps, and rubella ("MMR") vaccination administered on February 24, 2005. Petition at 1 (ECF No. 1).

Respondent filed a Motion to Dismiss in conjunction with his Rule 4(c) Report on August 2, 2021, stating, "[t]he petition in this case was [] filed beyond the relevant statutory limitations period, and petitioners have not provided a basis for the extraordinary remedy of equitable tolling," and therefore the petition should be dismissed. Respondent's Rule 4(c) Report ("Resp. Rept."), filed Aug. 2, 2021, at 12 (ECF No. 15); Resp. Motion to Dismiss ("Resp. Mot."), filed Aug. 2, 2021 (ECF No. 16). The undersigned agrees. Petitioners have failed to provide evidence to show why their case should not be dismissed.

Based on the reasons set forth below, the undersigned **GRANTS** respondent's motion to dismiss and **DISMISSES** petitioners' case for failure to file a timely action pursuant to Section 16(a)(2) of the Vaccine Act.

## II.   PROCEDURAL HISTORY

Petitioners filed their claim on May 7, 2021, on behalf of their minor child, W.J. Petition at 1. Petitioners alleged W.J. suffered from chronic encephalopathy and immunological issues as a result of an MMR vaccination administered on February 24, 2005. Id. Petitioners filed a compact disc of medical records along with the petition. Petitioners' Exhibits ("Pet. Exs.") 1-29.

On May 13, 2021, the case was assigned to the undersigned. Notice of Reassignment dated May 13, 2021 (ECF No. 9). An initial status conference was held on June 3, 2021, and the undersigned raised the threshold question of the statute of limitations. Order dated June 3, 2021, at 1 (ECF No. 14). The undersigned ordered respondent to file a Rule 4(c) Report and Motion to Dismiss, and to set a briefing schedule for petitioners to file a response. Id.

Respondent filed a Motion to Dismiss and Rule 4(c) Report on August 2, 2021. Resp. Rept.; Resp. Mot. In September and October 2021, petitioners filed medical records, medical literature, and a response to respondent's motion to dismiss. Pet. Exs. 30-72; Pet. Response to Resp. Mot. ("Pet. Response"), filed Sept. 30, 2021 (ECF No. 22). Respondent filed a reply to petitioners' response on October 28, 2021. Resp. Reply, filed Oct. 28, 2021 (ECF No. 27).

This matter is now ripe for adjudication.

## III.   PARTIES' CONTENTIONS

### A.   Petitioners' Contentions

Petitioners first allege that the MMR vaccine was inappropriately administered to W.J. in contravention of the vaccine's warnings due to W.J.'s Xq28 chromosomal duplication. Petition at 3. Petitioners contend "[m]any chromosomal aberrations cause immunodeficiencies" and the MMR vaccine was contraindicated for individuals with "[p]rimary and acquired immunodeficiency states." Id. The MMR vaccine insert also cautions against vaccination "to persons with a history of cerebral injury." Id. Petitioners state the MMR vaccine "significantly

aggravated [W.J.'s] pre-existing immunodeficiency, stemming from his Xq28 duplication." Id.
Additionally, petitioners allege that W.J.'s "chronic encephalopathy and immunodeficiency
issues were either directly caused by the administration of the MMR vaccine, or that the MMR
vaccine significantly aggravated pre-existing cerebral and immunological damage caused by
[W.J.'s] chromosomal aberration." Id. at 3-4, 11.

Second, petitioners allege W.J. suffered from thrombocytosis,[3] lymphocytopenia,[4]
lymphocytosis,[5] monocytosis,[6] granulocytopenia,[7] severe eczema, and "many other allergies"
that his "physicians offered no cause or diagnosis for." Petition at 4-8. They state "[o]ver the
course of some years that followed the administration of [W.J.'s] MMR vaccine, [W.J.'s]
immune system struggled with no less than four immuno-related blood disorders . . . and a
several years long battle with severe eczema, and many other allergies." Id. at 8. Petitioners
state that because W.J.'s physicians found no cause for his conditions, "in the absence of any
evidence to the contrary, [] the many immuno-related adverse events were caused by the MMR
vaccine administration to [W.J.] on February 24, 2005." Id. at 20.

Third, petitioners allege W.J. had an extremely high mumps antibody count on April 18,
2014, which "may be indicative of an unusual and chronic allergic reaction to the MMR
vaccine." Petition at 8.

Petitioners also allege that W.J. was admitted to the emergency room on June 22, 2007,
for a swollen jaw and face, and a high fever. Petition at 8. His blood test showed a high white
blood cell count and high lymphocyte, monocyte, and granulocyte counts. Id. at 9. Petitioners
state W.J.'s "symptoms during this hospitalization were very similar to mumps, which may point
to some adverse chronic reaction to the MMR vaccine." Id.

---

[3] Thrombocytosis is "an increase in the number of circulating platelets; called also
thrombocythemia." Thrombocytosis, Dorland's Online Med. Dictionary,
https://www.dorlandsonline.com/dorland/definition?id=49877 (last visited Feb. 3, 2022).

[4] Lymphocytopenia is the "reduction in the number of lymphocytes in the blood."
Lymphocytopenia, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/
dorland/definition?id=29030 (last visited Feb. 3, 2022).

[5] Lymphocytosis is the "excess of normal lymphocytes in the blood or in any effusion."
Lymphocytosis, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/
definition?id=29034 (last visited Feb. 3, 2022).

[6] Monocytosis is the "increase in the proportion of monocytes in the blood." Monocytosis,
Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/definition?
id=31969 (last visited Feb. 3, 2022).

[7] Granulocytopenia is the "reduction in the number of granular leukocytes in the blood."
Granulocytopenia, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/
definition?id=20930 (last visited Feb. 3, 2022).

Fifth, petitioners contend W.J. suffered from an encephalopathy Table injury after MMR vaccine administration. Petition at 10. "Prior to the administration of the MMR vaccine on February 24, 2005, [W.J.'s] medical records indicate no developmental delays or any other indication of mental incapacitation." Id. Petitioners allege that "[a]fter the administration of the MMR vaccine, [W.J.'s] developmental delays soon began to surface." Id. "The table injury timeframe for [W.J.'s] MMR injury is the fifteen days between February 24, 2005 and March 11, 2005." Id. at 11.

Sixth, petitioners allege equitable tolling of the statute of limitations is warranted. Petition at 12. Petitioners state W.J.'s encephalopathy is an "extraordinary circumstance" that tolls the statute of limitations in cases under the Vaccine Act and cite K.G. v. Secretary of Health & Human Services, 951 F.3d 1374 (Fed. Cir. 2020) for support. Petitioners contend the Federal Circuit in K.G. held "that equitable tolling under the Vaccine Act applied to an adult who was mentally incapacitated for some five years. . . . It stands to reason, then, that the same should apply to a minor with permanent brain damage." Id. at 13. Petitioners also state they exercised reasonable diligence in bringing this matter. Id. at 14. W.J. was diagnosed with autism and they "had no basis for questioning" his diagnosis. Id. at 15. However, petitioners state "that vaccines do sometimes cause or enhance autism-like symptoms." Id. at 16. Petitioners cite Paluck v. Secretary of Health & Human Services, 786 F.3d 1373, 1379 (Fed. Cir. 2015) where "K.P. won a favorable judgment based on his parents' amply supported allegation that he was a child 'suffering from both a mitochondrial disorder and autism who experienced developmental regression following vaccination.'" Id.

Petitioners discovered W.J.'s genetic aberration on March 19, 2019 and "soon came to the conclusion that because of the Xq28 duplication, [W.J.], in spite of his autism-like symptoms, either might not be autistic at all or that the Xq28 duplication is a cause of his autism." Id. at 17. They allege that they realized in light of the genetic mutation, the MMR vaccine should not have been administered, and that the MMR vaccine caused W.J.'s permanent injury. Id. at 18. W.J.'s parents assert that they exercised reasonable diligence and "the statute of limitations in this matter began to toll no earlier than March 19, 2019, when [W.J.'s] parents were first informed of his Xq28 duplication." Id.

Petitioners also allege "[t]o consider equitable tolling for K.G.'s drug and alcohol induced mental incapacity, but not for [W.J.'s] congenital genetically-caused mental incapacity, would be disability discrimination in violation of [W.J.'s] Fourteenth Amendment rights." Petition at 18. Petitioners cite Justice Marshall's concurring in part opinion in City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432 (1985) for support.

Finally, petitioners allege that the K.G. standard—"that the proper analysis of equitable tolling based on mental incapacity in the Vaccine Act context must consider both extraordinary circumstances and diligence"—applies in this matter. Petition at 19.

### B.   Respondent's Contentions

Respondent contends petitioners filed their claim for compensation "after the expiration of the statutorily prescribed limitations period set forth in Section 16(a)(2) of the Vaccine Act."

Resp. Reply at 1.  Further, respondent asserts that "petitioners have not demonstrated the extraordinary circumstances necessary to equitably toll the Act's statute of limitations."  Id.

Specifically, respondent states "[s]ymptoms of W.J.'s alleged injury began to manifest before March 2006, when W.J. was diagnosed with a speech delay.  Therefore, to comply with Section 16(a)(2) of the Vaccine Act, petitioners needed to file a petition on W.J.'s behalf by March 2009."  Resp. Reply at 2.  Respondent states that petitioners argue for the application of the discovery rule, "suggesting that the Act's statute of limitations should not have begun running until March 2019, when they conceived of a possible connection between W.J.'s autism and the MMR vaccine.  The Federal Circuit has held that there is no explicit or implied discovery rule under the Vaccine Act."  Id. at 3.  "Accordingly, [respondent contends that] the statutory filing period began to run in 2006, when W.J. experienced the first symptoms of his autism spectrum disorder—not in 2019, when petitioners devised a purported connection between W.J.'s symptoms and the MMR vaccine."  Id.

Regarding equitable tolling, respondent states, "petitioners have not shown a diligent pursuit of W.J.'s rights or extraordinary circumstances."  Resp. Reply at 4.  "The Federal Circuit has expressly held that equitable tolling is not a substitute for the discovery rule and is not available simply because the application of the statute of limitations would otherwise deprive a petitioner of his claim."  Id.  "W.J.'s age and incapacity are not bases for equitable tolling."  Id.  Respondent claims K.G. does not support petitioners' position.  First, "K.G. was an incapacitated adult."  Id. at 5.  "Her relationship with her appointed guardian became strained and was later terminated.  Id.  "Accordingly, during the relevant time period, K.G. had no one to act on her behalf and was incapable of filing a claim under the Vaccine Act; for this reason, the Court found that equitable tolling was appropriate in her case."  Id.  Respondent alleges, "[u]nlike K.G., W.J. was an infant at the time of his vaccination, and his parents (the petitioners) were entirely capable of filing a claim on his behalf."  Id.  Respondent also argues that "[t]aken to its logical conclusion, petitioners' equitable tolling argument would essentially mean that the three-year statute of limitations is irrelevant in all cases involving young children who cannot file claims on their own behalf.  This is not what the Vaccine Act contemplates."  Id.

Lastly, the respondent asserts that petitioners have not provided a procedural basis for their assertions.  "Procedurally, petitioners have not demonstrated a basis for equitable tolling, and their claim should be dismissed as untimely."  Resp. Reply at 6.  To the extent that petitioners are asserting an injury based on their child's condition of autism, the respondent points out that "[s]ubstantively, it is important to note that the theory of MMR vaccines causing autism has been thoroughly evaluated and repeatedly rejected by the courts."  Id.

## IV.    FACTUAL SUMMARY[8]

---

[8] The factual summary is abbreviated to provide relevant information.  Additionally, complete medical records were not filed.  The records that have been filed, however, are sufficient for the purposes of this Decision.

W.J. was born on February 8, 2004.  Pet. Ex. 1 at 1.  He was a healthy, full-term infant, with no significant neonatal problems apart from meconium which was suctioned at birth.  Pet. Ex. 5 at 1; Pet. Ex. 13.

W.J. received several childhood vaccinations, including influenza ("flu") vaccines from Dr. Stephen Borchman.  Pet. Ex. 2 at 1.  W.J. received his first hepatitis B vaccine on February 8, 2004, his second hepatitis B vaccine on May 12, 2004, and his third hepatitis B vaccine on August 23, 2004.  Id.  He also received his diphtheria-tetanus-acellular pertussis ("DTaP") vaccinations in April, June, and August 2004, August 2005, and February 2009.  Id.  The Haemophilus influenzae type B ("hib") vaccines were given at the same time as DTaP in April, June, and August 2004.  Id.  W.J. received his pediatric pneumococcal ("PCV7") and polio ("IPV") vaccinations in 2004, 2005, and 2009.  Id.  MMR vaccinations were administered on February 24, 2005 and March 15, 2008.  Id.  Flu vaccines were given in 2007, 2008, and 2010.  Id.  No adverse reaction to any of the vaccines was noted in the medical records.

On March 7, 2006, Dr. Ann Marie Abbondante examined W.J. and diagnosed him with a "speech delay."  Pet. Ex. 6 at 13.  W.J. then underwent an audiology evaluation on June 26, 2006, which revealed adequate hearing.  Pet. Ex. 8 at 1.  Dr. Abbondante ordered a blood test performed on March 9, 2006 that showed high platelet levels (424, normal range is 140-400) and low lymphocyte levels (3,276, normal range is 4,400-10,500).  Pet. Ex. 9 at 1.  Dr. Abbondante did not diagnose W.J. with encephalopathy or any immunodeficiencies.

On January 5, 2007, W.J. was diagnosed with Autism and Pervasive Developmental Delay following a psychological evaluation at Words 'N Motion Pediatric Multi-Disciplinary Diagnostic Evaluation and Treatment Center by Psychologist D. Jeanne Romeo.  Pet. Ex. 39 at 17.

W.J. presented to Dr. John Wells, pediatric neurologist, for a neurologic evaluation on January 24, 2007.  Pet. Ex. 13 at 1.  Dr. Wells stated W.J.'s developmental delays and language disorder required intensive therapeutic programs.  Id.  At that time, Dr. Wells considered ordering an MRI and genetic testing depending on W.J.'s progress.  Id.  Dr. Wells did not diagnosis W.J. with encephalopathy.

From June 22 to June 25, 2007, W.J. was hospitalized with a fever and swollen glands.  Pet. Ex. 12 at 11.  W.J. presented in the emergency room with swelling in the jaw and neck, runny nose, and a moderately-sore throat.  Id. at 9.  His white blood cell count was consistent with a bacterial infection, and he was admitted to the hospital with a diagnosis of cervical lymphadenitis.[9]  Id. at 11, 18.  Three days later, he was discharged with antibiotics.  Id. at 11.  Bloodwork performed on July 3, 2007, showed W.J. had an elevated white blood count (11.9, normal range is 4.8-10.8), elevated platelet count (548), as well as high monocyte (0.6, normal range is 0.11-0.59) and lymphocyte numbers (5.9, normal range is 1.2-3.4).  Pet. Ex. 10 at 7.

---

[9] Cervical lymphadenitis is the "enlarged, inflamed, and tender cervical lymph nodes, seen in certain infectious diseases of children, such as acute infections of the throat."  Cervical Lymphadenitis, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/definition?id=87515 (last visited Feb. 3, 2022).

W.J. was not diagnosed with encephalopathy at any time during this hospitalization. Additionally, W.J. was not diagnosed with any immunodeficiencies.

W.J. attended yearly follow-up visits with Dr. Borchman from February 2009 to February 2014. Pet. Ex. 7 at 3-11. On February 21, 2011, W.J. presented to Dr. Borchman for a follow up of strep throat. Id. at 5. Dr. Borchman noted W.J.'s moderate to severe autism diagnosis. Id. W.J. also received his first hepatitis A vaccine. Id. No adverse reaction to the vaccine was noted. During these years, W.J. was not diagnosed with encephalopathy or immunodeficiencies.

On February 20, 2012, W.J. returned to Dr. Borchman for atopic dermatitis. Pet. Ex. 7 at 7. Dr. Borchman again noted W.J.'s moderate to severe autism, and a past history of lead poisoning. Id.; Pet. Ex. 10 at 9. Dr. Borchman assessed W.J. for "unstable atopic dermatitis" and ordered heavy metal testing to rule out lead poisoning, plus allergy testing. Pet. Ex. 7 at 7. Dr. Borchman explained to petitioners there was a lack of data associating autism spectrum disorders with diet. Id. W.J.'s blood work showed he had numerous abnormal reactions to a variety of allergens and had an elevated platelet count (496). Pet. Ex. 10 at 11.

On February 19, 2014, W.J. returned to Dr. Borchman for eczema and rhinitis. Pet. Ex. 7 at 10. W.J. had numerous environmental allergies, and Dr. Borchman documented that his parents "refuse[] any steroid nasal sprays" and medications. Id. Dr. Borchman also expressed his concern with W.J.'s mother's refusal to use prescription steroid creams or any medications to control W.J.'s allergies. Id. at 10-11. W.J.'s mother agreed to return to W.J.'s immunologist, Dr. Russo, and to restart allergy and eczema medications. She refused the diphtheria, pertussis, and tetanus ("DPT") vaccine. Id. at 11.

On April 4, 2014, W.J. underwent a variety of lab tests, including genetic screening, ordered by Dr. Maya Klein. Pet. Ex. 11 at 1-10. Testing showed a normal blood panel, normal platelet count, and normal levels of heavy metals. Id. at 1-3. W.J. exhibited high antibodies to the mumps virus (71.2, negative range <9.0), and the records noted that "[a] positive result generally indicates past exposure to Mumps virus or previous vaccination." Id. W.J. also had elevated antibodies to the Streptococcus B virus (210, negative range 0-170), herpes virus (17.66, negative range, <0.76), and pneumonia virus (118, indeterminate range 100-320), noting "[v]alues >100 may indicate a recent infection . . . and need to be confirmed." Id. at 4, 6, 8. Genetic testing revealed a MTHFR homozygous A1298C mutation.[10] Id. at 4, 6, 8.

W.J. presented to Dr. Maria Del Pilar Trelles-Thorne for a psychiatric evaluation on July 9, 2018. Pet. Ex. 71 at 59. Dr. Trelles-Thorne performed a comprehensive evaluation to help

---

[10] MTHFR is "a common, autosomal recessive, inborn error of folate metabolism caused by mutation in the MTHFR gene (locus: 1p36.3), which encodes the enzyme. The chief biochemical finding is homocystinuria with normal levels of plasma methionine." Methylene Tetrahydrofolate Reductase (MTHFR) Deficiency, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/definition?id=30976 (last visited Jan. 21, 2022). "Clinical manifestations, age of onset, and severity are highly variable; characteristics include signs of neurologic damage ranging from psychiatric symptoms to fatal developmental delay, microcephaly, ectopia lentis, and thrombosis." Id.

petitioners manage W.J.'s irritability, mood swings, and poor sleep.  Id.  Dr. Trelles-Thorne prescribed Risperdal.[11]  Id. at 60.

W.J. returned to Dr. Trelles-Thorne on January 30, 2019, for medication management of irritability and disruptive behaviors.  Pet. Ex. 71 at 32.  Dr. Trelles-Thorne ordered a number of medications for W.J. and noted his autism spectrum disorder diagnosis.  Id. at 33-34.

On February 22, 2019, W.J. underwent genetic testing that revealed he had a duplication on the Xq28 chromosome of "uncertain clinical significance—likely benign."  Pet. Ex. 14 at 1.

On February 11, 2021, Dr. Trelles-Thorne saw W.J. for psychopharmacology evaluation. Pet. Ex. 71 at 2.  W.J. was noted to have autism spectrum disorder and unspecified bipolar disorder.  Id.  Dr. Trelles-Thorne changed W.J.'s dosage of lithium.[12]  Id. at 3.  The records do not indicate that Dr. Trelles-Throne ever diagnosed W.J. with encephalopathy or any immunodeficiency disorder.

Although the petitioners allege that the MMR vaccination administered to W.J. on February 24, 2005 caused encephalopathy as well as a number of immunodeficiencies, the medical records do not include a diagnosis of encephalopathy or immunodeficiency disorder. See Petition at 1.

## V.      LEGAL FRAMEWORK

### A.      Vaccine Act Statute of Limitations

Section 16(a)(2) of the Vaccine Act governs claims resulting from vaccines administered after October 1, 1988, and reads,

> if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury.

---

[11] Risperdal is a trademark name for risperidone, "a benzisoxazole derivative used as an antipsychotic agent."  Risperdal, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/definition?id=43964 (last visited Jan. 20, 2022); Risperidone, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/ definition?id=43965 (last visited Jan. 20, 2022).

[12] Lithium carbonate, the carbonate salt of lithium, is "used as a mood stabilizer in treatment of acute manic and hypomanic states in bipolar disorder and in maintenance therapy to reduce the intensity and frequency of subsequent manic episodes."  Lithium Carbonate, Dorland's Online Med. Dictionary, https://www.dorlandsonline.com/dorland/definition?id=87087 (last visited Jan. 21, 2022).

§ 16(a)(2).  Therefore, claims resulting from vaccines administered <u>after</u> October 1, 1988 must be filed within 36 months of the first symptom or manifestation of onset of the alleged vaccine-related injury.  The statute of limitations begins to run from the onset of the first objectively cognizable symptom, whether or not that symptom is sufficient for diagnosis.  <u>Carson v. Sec'y of Health & Hum. Servs.</u>, 727 F.3d 1365, 1369 (Fed. Cir. 2013).  Special masters have appropriately dismissed cases that were filed outside the limitations period, even by a single day or two.  <u>See, e.g.</u>, <u>Spohn v. Sec'y of Health & Hum. Servs.</u>, No. 95-0460V, 1996 WL 532610 (Fed. Cl. Spec. Mstr. Sept. 5, 1996) (dismissing case filed one day beyond the 36-month limitations period), <u>aff'd</u>, 132 F.3d 52 (Fed. Cir. 1997); <u>Cakir v. Sec'y of Health & Hum. Servs.</u>, No. 15-1474V, 2018 WL 4499835, at *4 (Fed. Cl. Spec. Mstr. July 12, 2018).

> **B.    Motion to Dismiss**

Although the Vaccine Act and the Vaccine Rules contemplate case dispositive motions, the dismissal procedures included within the Vaccine Rules do not specifically include a mechanism for a motion to dismiss.  <u>See</u> §§ 12(d)(2)(C)-(D); Vaccine Rule 8(d); Vaccine Rule 21.  However, Vaccine Rule 1 provides that for any matter not specifically addressed by the Vaccine Rules, the special master may regulate applicable practice consistent with the rules and the purpose of the Vaccine Act.  Vaccine Rule 1(b).  Vaccine Rule 1 also provides that the Rules of the Court of Federal Claims ("RCFC") may apply to the extent they are consistent with the Vaccine Rules.  Vaccine Rule 1(c).

Accordingly, there is a well-established practice of special masters entertaining motions to dismiss in the context of RCFC 12(b)(6), which allows the defense of "failure to state a claim upon which relief can be granted" to be presented via motion.  <u>See, e.g.</u>, <u>Herren v. Sec'y of Health & Hum. Servs.</u>, No. 13-1000V, 2014 WL 3889070 (Fed. Cl. Spec. Mstr. July 18, 2014); <u>Bass v. Sec'y of Health & Hum. Servs.</u>, No. 12-135V, 2012 WL 3031505 (Fed. Cl. Spec. Mstr. June 22, 2012); <u>Guilliams v. Sec'y of Health & Hum. Servs.</u>, No. 11-716V, 2012 WL 1145003 (Fed. Cl. Spec. Mstr. Mar. 14, 2012); <u>Warfle v. Sec'y of Health & Hum. Servs.</u>, No. 05-1399V, 2007 WL 760508 (Fed. Cl. Spec. Mstr. Feb. 22, 2007).

Under RCFC 12(b)(6), a case should be dismissed "when the facts asserted by the claimant do not entitle him to a legal remedy."  <u>Extreme Coatings, Inc. v. United States</u>, 109 Fed. Cl. 450, 453 (2013) (quoting <u>Lindsay v. United States</u>, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).  In considering a motion to dismiss under RCFC 12(b)(6), allegations must be construed favorably to the pleader.  <u>Id.</u> (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).  However, the pleading must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Golden v. United States</u>, 137 Fed. Cl. 155, 169 (2018) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)); <u>see also</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

"To determine whether a complaint states a plausible claim for relief, the court must engage in a context-specific analysis and 'draw on its judicial experience and common sense.'"  <u>Golden</u>, 137 Fed. Cl. at 169 (quoting <u>Iqbal</u>, 556 U.S. at 679).  However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."  <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989).  Nonetheless, on a motion to dismiss, courts "are

not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). In assessing motions to dismiss in the Vaccine Program, special masters have concluded that they "need only assess whether the petitioner could meet the Act's requirements and prevail, drawing all inferences from the available evidence in petitioner's favor." Herren, 2014 WL 3889070, at *2; see also Warfle, 2007 WL 760508, at *2.

### C.    Doctrine of Equitable Tolling

The Federal Circuit has held that the doctrine of equitable tolling can apply to Vaccine Act claims in limited circumstances. See Cloer v. Sec'y of Health & Hum. Servs., 654 F.3d 1322, 1340-41 (Fed. Cir. 2011). The Federal Circuit determined equitable tolling on the basis of mental incompetence is available in Vaccine Act cases. K.G., 951 F.3d at 1381. However, lack of knowledge of an actionable claim is not a basis for equitable tolling. Id. at 1380 (citing Cloer, 654 F.3d at 1344-45).

To establish that equitable tolling of a statute of limitations is appropriate, a claimant must prove (1) he pursued his rights diligently and (2) an extraordinary circumstance prevented him from timely filing the claim. K.G., 951 F.3d at 1379 (citing Menominee Indian Tribe v. United States, 136 S. Ct. 750, 755 (2016). In K.G., the Federal Circuit determined "the proper analysis of equitable tolling based on mental incapacity in the Vaccine Act context must consider both extraordinary circumstances and diligence." Id. at 1381. All relevant facts and circumstances must be considered when determining whether a claimant pursued his rights diligently. Id. at 1382. "It is possible, for instance, that a reasonable amount of diligence for an individual with memory loss or hallucinations would equate to no diligence for an able-minded individual." Id. Additionally, "[a] claimant need only establish diligence during the period of extraordinary circumstances to meet this test." Id. (citing Checo v. Shinseki, 748 F.3d 1373, 1380 (Fed. Cir. 2014)).

To show extraordinary circumstances, "a Vaccine Act claimant must show that [his] failure to file was the direct result of a mental illness or disability that rendered [him] incapable of rational thought, incapable of deliberate decision making, incapable of handling [his] own affairs, or unable to function in society." K.G., 951 F.3d at 1381. However, "[a] medical diagnosis alone or vague assertions of mental problems are insufficient" to establish extraordinary circumstances. Id. at 1381-82.

Under the provisions of the Vaccine Act, a petition seeking compensation on behalf of a minor may only be filed by the minor's "legal representative," § 11(b)(1)(A), a term which the Act defines as "a parent or an individual who qualifies as a legal guardian under State law." § 33(2).

### D.    Equal Protection Under the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment to the Constitution, and through the Due Process Clause of the Fifth Amendment, implicitly forbids most discriminations by the Federal Government against individuals. Bolling v. Sharpe, 347 U.S. 497 (1954). A potential violation of equal protection arises whenever the Government treats one group

differently than it treats another while it pursues some social goal.  Black v. Sec'y of Health & Hum. Servs., 33 Fed. Cl. 546, 554 (1995), aff'd sub nom. Black v. Sec'y of Health & Hum. Servs., 93 F.3d 781 (Fed. Cir. 1996).  Legislation, which classifies people into favored and nonfavored groups based upon race, is subject to "strict scrutiny."  Palmore v. Sidoti, 466 U.S. 429 (1984); Loving v. Virginia, 388 U.S. 1 (1967); Anderson v. Martin, 375 U.S. 399 (1964).

However, under the Vaccine Program, the Vaccine Act's limitation period is rationally related to the dual legitimate legislative purposes undergirding the Vaccine Act: (1) the settling of claims quickly and easily, and (2) the protecting of manufacturers from uncertain liability making "production of vaccines economically unattractive, potentially discouraging vaccine manufacturers from remaining in the market."  Cloer v. Sec'y of Health & Hum. Servs., 85 Fed. Cl. 141, 151-52 (2008) (quoting Brice v. Sec'y of Health & Hum. Servs., 240 F.3d 1367, 1368 (Fed. Cir. 2001)), rev'd on other grounds, 603 F.3d 1341 (Fed. Cir. 2010), aff'd on rehearing en banc, 654 F.3d 1322 (Fed. Cir. 2011).

## VI.    DISCUSSION

### A.    Applicable Statute of Limitations in the Vaccine Program

#### 1.    Alleged Injuries in the Petition

Petitioners allege that W.J. sustained injuries, including "chronic encephalopathy and immunodeficiency issues," resulting from adverse effects of the MMR vaccination received on February 24, 2005.  Petition at 3.  Petitioners allege that W.J.'s "chronic encephalopathy and immunodeficiency issues were either directly caused by the administration of the MMR vaccine, or that the MMR vaccine significantly aggravated pre-existing cerebral and immunological damage caused by [W.J.'s] chromosomal aberration."  Id. at 4.  Petitioners also alleged that W.J. suffered from thrombocytosis, lymphocytopenia, lymphocytosis, monocytosis, granulocytopenia, severe eczema, and "many other allergies" that his "physicians offered no cause or diagnosis for;" an extremely high mumps antibody count on April 18, 2014, which "may be indicative of an unusual and chronic allergic reaction to the MMR vaccine;" and an emergency room visit for a swollen jaw and face and high fever, and "symptoms during this hospitalization were very similar to mumps, which may point to some adverse chronic reaction to the MMR vaccine." Petition at 4-9.  Finally, petitioners allege W.J. suffered a chronic encephalopathy Table Claim. Id. at 11.

##### a.    Petitioners' Table Claim

The Vaccine Injury Table defines chronic encephalopathy as a condition that "occurs when a change in mental or neurologic status, first manifested during the applicable Table time period as an acute encephalopathy or encephalitis, persists for at least 6 months from the first symptom or manifestation of onset or of significant aggravation of an acute encephalopathy or encephalitis."  42 C.F.R. § 100.3(d)(1)(i).  Acute encephalopathy, for children less than 18 months of age, that presents without a seizure "is indicated by a significantly decreased level of consciousness that lasts at least 24 hours."  42 C.F.R. § 100.3(c)(2)(i)(A)(1).  Typical symptoms of encephalopathy include, but do not in themselves demonstrate an acute encephalopathy or a

significant change in either mental status or level of consciousness, "[s]leepiness, irritability (fussiness), high-pitched and unusual screaming, poor feeding, persistent inconsolable crying, bulging fontanelle, or symptoms of dementia." 42 C.F.R. § 100.3(c)(2)(i)(C). Exclusionary criteria for encephalopathy include, "[a]n underlying condition or systemic disease shown to be unrelated to the vaccine (such as malignancy, structural lesion, psychiatric illness, dementia, genetic disorder, prenatal or perinatal central nervous system (CNS) injury)." 42 C.F.R. § 100.3(c)(2)(ii)(A). The time period for first symptom or manifestation of onset or of significant aggravation of encephalopathy is between 5 and 15 days after MMR vaccine administration. 42 C.F.R. § 100.3(a)(III)(B).

Petitioners alleged, "[p]rior to the administration of the MMR vaccine on February 24, 2005, [W.J.'s] medical records indicate no developmental delays or any other indication of mental incapacitation." Petition at 10. "After the administration of the MMR vaccine, [W.J.'s] developmental delays soon began to surface." Id. Petitioners cited W.J.'s March 7, 2006 doctor's appointment where he was diagnosed with speech delay as evidence of his developmental delays.

Petitioners claim,

Given the before and after circumstantial evidence in the record, and based on the record as a whole, the Special Master should find that "the first symptom or manifestation of onset" of [W.J.'s] chronic encephalopathy, or the "significant aggravation" of a pre-existing encephalopathy, occurred within the fifteen-day time period described in the Vaccine Injury Table, "even though the occurrence of such symptom or manifestation within the time period was not recorded." 42 U.S.C. § 300aa-13(b)(2).

Petition at 11.

"The symptoms associated with an acute encephalopathy are neither subtle nor insidious." Blake v. Sec'y of Health & Hum. Servs., No. 03-31V, 2014 WL 2769979, at *6 (Fed. Cl. Spec. Mstr. May 21, 2014) (quoting Waddell v. Sec'y of Health & Hum. Servs., No. 10-316V, 2012 WL 4829291, at *6 (Fed. Cl. Spec. Mstr. Sept. 19, 2012)). Acute and chronic encephalopathy is a serious injury that can necessitate hospitalization. Miller v. Sec'y of Health & Hum. Servs., No. 02-235V, 2015 WL 5456093, at *37 (Fed. Cl. Spec. Mstr. Aug. 18, 2015).

W.J. has never been diagnosed with acute or chronic encephalopathy, nor have any of his treating physicians suspected the condition or noted either conditions as a differential diagnosis in the medical records. Therefore, in assessing all inferences from the available evidence in petitioner's favor, the undersigned finds that W.J. did not suffer from encephalopathy and does not fulfill the criteria for an encephalopathy Table claim.

However, even if petitioners were able to establish W.J. suffered an encephalopathy Table injury, petitioners filed their claim beyond the statute of limitations. W.J. received the MMR vaccine on February 24, 2005. In order for the encephalopathy Table claim to apply, W.J.'s injury would have to have manifested between 5 and 15 days after MMR vaccine

12

administration, or by March 11, 2005.  Therefore, petitioners had 36 months from March 11, 2005 to file a Table claim in the Vaccine Program, or by March 11, 2008.  Petitioners did not file their petition until May 7, 2021, and thus any Table claim is time-barred.

### b.        Cause-In-Fact Injuries

### i.        Chronic Encephalopathy

First, in regard to W.J.'s "chronic encephalopathy" claim, W.J. medical records do not include a diagnosis of or reference to encephalopathy or chronic encephalopathy by his treating physicians.  W.J. was seen by multiple physicians to review his developmental progress, including Dr. Abbondante on March 7, 2006 who diagnosed him with speech delay, psychologist Romeo who diagnosed him with autism on January 5, 2007, and Dr. Wells who conducted a neurologic evaluation on January 24, 2007.  None of W.J.'s treating physicians diagnosed or mentioned encephalopathy.

There is no evidence in W.J.'s medical records establishing that he was diagnosed with chronic encephalopathy.  Thus, the undersigned finds that petitioners have failed to provide evidence with regard to the injury or condition of encephalopathy.

W.J. received the MMR vaccination at issue on February 24, 2005.  W.J.'s medical records show W.J. was diagnosed "speech delay" on March 7, 2006, and with autism spectrum disorder on January 5, 2007.  Pet. Ex. 6 at 13; Pet. Ex. 39 at 17.  Even if petitioners were able to establish W.J. suffered a chronic encephalopathy injury, petitioners filed their claim beyond the statute of limitations.  Assuming the date of diagnosis for either condition (speech delay or autism spectrum disorder) was the first symptom or manifestation of the alleged vaccine-related injury, petitioners would have been required to file their petition prior to March 7, 2009 or January 5, 2010.  Petitioners did not file their petition until May 7, 2021, and thus their claim is time-barred.

### ii.        Immunodeficiency Issues

In regard to W.J.'s "immunodeficiency issues" claim, petitioners alleged that W.J.'s blood tests on March 9, 2006, June 23, 2007, July 3, 2007, April 13, 2007, February 12, 2012, and April 8, 2014 "demonstrate[d] that his immune system suffered from irregularities for several years after the administration of the MMR vaccine."  Petition at 4.  However, the blood tests do not constitute evidence of a diagnosis of an immunodeficiency disorder.  And the medical records do not contain any evidence that W.J. was diagnosed with an immunodeficiency disorder.

First, petitioners allege W.J. struggled with thrombocytosis.  Petition at 4.  Petitioners state W.J.'s blood sample collected on March 9, 2006 showed a high platelet count at 424 (normal range 140-400).  Id.  They state lab results were "indicative of a blood disorder known as thrombocytosis."  Id.  Petitioners then point to a blood samples drawn on July 3, 2007 and February 20, 2012, which again showed a high platelet counts (548 and 469, respectively).  However, on April 4, 2014, W.J. had a normal platelet count.  W.J.'s abnormal platelet counts

occurred during periods when he was ill.  Further, none of W.J.'s physicians diagnosed him with thrombocytosis.

Similarly, from blood samples collected on March 9, 2006, April 13, 2007, and July 3, 2007, petitioners state these lab results showed an "indication" of blood disorders known as "lymphocytopenia or lymphopenia," "lymphocytosis," "monocytosis," and "granulocytopenia, a form of immunosuppression."  Petition at 5-7.  Again, these blood tests were drawn when W.J. was ill with a viral or bacterial infection.  Most importantly, W.J.'s treating physicians did not diagnose W.J. with an abnormal immune illness due to these lab results.

Petitioners also alleged that W.J. suffered from eczema and "many other allergies," and stated "[t]here is research pointing to eczema as an autoimmune disease."  Petition at 8. Additionally, petitioners stated W.J.'s April 2014 lab results indicated he had high mumps antibodies that "may be indicative of an unusual and chronic allergic reaction to the MMR vaccine."  Id.  However, the lab results state that "[a] positive result generally indicates past exposure to Mumps virus or previous vaccination."  Pet. Ex. 11 at 3.

Finally, petitioners stated W.J.'s hospitalization on June 22, 2007 showed a high white blood count as well as high lymphocyte, monocyte, and granulocyte counts.  Id. at 8-9. Petitioners allege that W.J.'s "symptoms during this hospitalization were very similar to mumps, which may point to some adverse chronic reaction to the MMR vaccine."  Id. at 9.  However, the petitioners provide no evidence to suggest that W.J. had any adverse reaction to the MMR vaccine.

W.J. was never diagnosed with an immunodeficiency disorder and petitioners' own statements and beliefs are not evidence of a diagnosis of an immunodeficiency disease or disorder.  W.J.'s physicians did not associate his illnesses with an immunodeficiency disorder or with the MMR vaccine, or any of W.J.'s vaccinations.  During his hospitalization in June 2008, his physicians noted his white blood cell count was consistent with a bacterial infection and he was diagnosed of cervical lymphadenitis.  However, W.J. was not diagnosed with an immunodeficiency disease or disorder.  Overall, there is no evidence in W.J.'s medical records establishing that he was diagnosed with an immunodeficiency disorder.

Even if petitioners were able to establish W.J. suffered from an immunodeficiency disorder, petitioners filed their claim beyond the statute of limitations.  The records show W.J. received a number of blood tests that showed, at various times, high platelet count (March 9, 2006), low absolute lymphocyte count (March 9, 2006), high lymphocyte count (April 13, 2007), high monocyte count (April 13, 2007), and low granulocyte count (April 13, 2007).  Dr. Borchman diagnosed W.J. with unstable atopic dermatitis on February 20, 2012, and diagnosed eczema and rhinitis on February 19, 2014.  Thus, petitioners' allegations that W.J.'s immune system struggled with "no less than four immuno-related blood disorders: granulocytopenia, lymphocytopenia, lymphocytosis, and monocytosis, and a several years long battle with severe eczema, and many other allergies" is untimely.

In order to have filed a timely petition for thrombocytosis and lymphocytopenia, petitioners would have needed to assert these alleged injuries before March 9, 2009, 36 months

14

after the 2006 blood test. For the lymphocytosis, granulocytopenia, and monocytosis allegations, petitioners would have needed to assert these alleged injuries before April 13, 2010, 36 months after the 2007 blood test. For the eczema and "many other allergies" claims, petitioners would have needed to assert these alleged injuries before February 20, 2015, 36 months after Dr. Borchman's exam and allergy testing. Assessing all inferences from the available evidence in petitioner's favor, petitioners' claims are time-barred.

Additionally, even if W.J.'s hospitalization on June 22-24, 2007 and high mumps count on April 8, 2014, were caused by the MMR vaccination, petitioners were required to file their petition prior to June 24, 2010 and April 8, 2017, respectively. Petitioners did not file their petition until May 7, 2021. As filed, the onset of W.J.'s claim, in order to be timely under the Vaccine Act, would have had to occur on or after May 7, 2018. Thus, their claim is time-barred.

### c.    Significant Aggravation Injuries

Petitioners argue W.J.'s "chronic encephalopathy and immunodeficiency issues were either directly caused by the administration of the MMR vaccine, or the MMR vaccine caused 'significant aggravation' of pre-existing cerebral and immunological damage caused by [W.J.'s] Xq28 duplication, a chromosomal aberration." Petition at 2. As discussed above, petitioners failed to provide evidence that the MMR vaccine caused-in-fact W.J.'s alleged injuries.

As set forth earlier, there is no factual support in the contemporaneous medical records to support chronic encephalopathy or immunodeficiency disorder occurred after vaccination. Because there is no evidence, petitioners' significant aggravation claims fail as well.

Petitioners argue that the MMR vaccine caused significant aggravation of pre-existing cerebral and immunological damage caused by W.J.'s Xq28 duplication. However, petitioners have failed to provide any evidence to suggest vaccination or the Xq28 chromosomal duplication significantly or was any way associated with W.J.'s alleged injuries. Genetic testing on February 22, 2019, revealed the Xq28 chromosome duplication was "of uncertain clinical significance—likely benign." Pet. Ex. 14 at 1. None of W.J.'s physicians have documented that W.J.'s vaccinations or his genetic testing was associated with his alleged injuries.

Further, as discussed above, even if petitioners were able to establish the MMR vaccine significantly aggravated W.J.'s pre-existing injuries, petitioners filed their claim beyond the statute of limitations.

### 2.    Equitable Tolling

The Vaccine Act required petitioners to file their claim on behalf of W.J. under the Vaccine Act within 36 months of the onset of the earliest symptom or manifestation of an injury. See Markovich v. Sec'y of Health & Hum. Servs., 447 F.3d 1353, 1357 (Fed. Cir. 2007) (holding that "either a 'symptom' or a 'manifestation' of onset of a vaccine-related injury is the first event objectively recognizable as a sign of a vaccine injury by the medical profession at large").[13]

---

[13] For cases that have been dismissed for failure to file within the prescribed statute of

The petition was filed on May 7, 2021.  In order for petitioners' vaccine claim to be timely, W.J. would have had to experience the initial onset of his vaccine-related injuries, as pled in the petition, on or after May 7, 2018.  Any claims for injuries that manifested prior to May 7, 2018, are time-barred.

However, petitioners assert equitable tolling of the statute of limitations is warranted in this matter.  For equitable tolling to apply, petitioners must prove two elements: (1) they pursued their rights diligently, and (2) an extraordinary circumstance prevented them from timely filing the claim.  K.G., 951 F.3d at 1379.  In K.G., the court allowed equitable tolling for the period of K.G.'s mental incapacity and held equitable tolling is available to mentally incapacitated individuals under the Vaccine Act.  Id.  In that case, petitioner, an adult, alleged the flu vaccine caused chronic inflammatory demyelinating polyneuropathy ("CIDP") in 2011.  Id. at 1376.  "During the same period, K.G. succumbed to alcoholism, spent months in the hospital, and developed amnesia.  In Spring 2014, an Iowa state court declared K.G. incapable of caring for herself and, against K.G.'s will, appointed K.G.'s sister as her guardian."  Id.  K.G. regained her mental faculties by May 2016 and filed a claim in the Vaccine Program for her alleged vaccine injury in January 2018.  Id.

Unlike K.G., W.J. was an infant at the time of his vaccination, and the petitioners, W.J.'s parents, were capable of filing a claim on his behalf.  W.J.'s parents have not filed any evidence to suggest that they were incapacitated in any way during any time frame relevant to their petition.  While the Court in K.G. confirmed an equitable tolling right for incapacitated individuals, nothing in the decision negated a legal representative's rights and responsibilities under the Vaccine Act.  A legal representative is "a parent or an individual who qualifies as a legal guardian under State law."  § 33(2).  The Vaccine Act expressly permits a legal representative to file a petition for compensation on behalf of a minor.  § 11(b)(1)(A).  Therefore, petitioners had the right and responsibility to bring a timely claim on W.J.'s behalf.  The decision in K.G. did not alter this provision.

W.J.'s "mental incapacity" does not serve as an "extraordinary circumstance."  Petitioners, as W.J.'s legal representatives as his parents, had the ability to file a petition 36 months from the onset of the earliest symptom or manifestation of W.J.'s injury.  The same is true for all petitions brought on behalf of all minors.  Parents or other legal representatives must file the petition on behalf of a minor within the applicable statute of limitations.

   3.   **The Discovery Rule**

---

limitations, see Villalobos ex rel. A.D. v. Sec'y of Health & Hum. Servs., No. 20-96V, 2020 WL 5797865 (Fed. Cl. Spec. Mstr. Sept. 2, 2020); Palencia ex rel. C.A.P. v. Sec'y of Health & Hum. Servs., No. 20-180V, 2020 WL 5798504 (Fed. Cl. Spec. Mstr. Sept. 2, 2020); Edoo v. Sec'y of Health & Hum. Servs., No. 13-302V, 2014 WL 1381341 (Fed. Cl. Spec. Mstr. Mar. 19, 2014); Boettcher v. Sec'y of Health & Hum. Servs., No. 17-1402V, 2018 WL 2925043 (Fed. Cl. Spec. Mstr. May 2, 2018).

Petitioners argue that it was not until genetic testing on March 19, 2019 which revealed that W.J. had a chromosomal aberration known as Xq28 duplication, that they believed that the MMR vaccine should not have been administered to him.  Petition at 17-18.  The petitioners assert "the statute of limitations in this matter began to toll no earlier than March 19, 2019, when [W.J.'s] parents were first informed of his Xq28 duplication."  Id. at 18.

Essentially, petitioners argue for the application of a discovery rule, suggesting that the Act's statute of limitations should not have begun running until March 19, 2019.  The Federal Circuit has held that there is no explicit or implied discovery rule under the Vaccine Act.  Cloer, 654 F.3d at 1337.  The date of the occurrence of the first symptom or manifestation of onset "does not depend on when a petitioner knew or reasonably should have known anything adverse about [the] condition."  Id. at 1339.  Nor does it depend on when a petitioner knew or should have known of a connection between an injury and a vaccine.  Id. at 1338 ("Congress made the deliberate choice to trigger the Vaccine Act statute of limitations from the date of occurrence of the first symptom or manifestation of the injury for which relief is sought, an event that does not depend on the knowledge of a petitioner as to the cause of an injury."); see also Markovich, 477 F.3d at 1358 ("Congress intended the limitations period to commence to run prior to the time a petitioner has actual knowledge that the vaccine recipient suffered from an injury that could result in a viable cause of action under the Vaccine Act.").  Accordingly, the statutory filing period was not tolled until March 19, 2019, when petitioners learned of W.J.'s test results.

### 4.     Fraud

Petitioners claim they were unable to file a claim on behalf of W.J. because the government fraudulently concealed the connection between vaccines and autism.  Petition at 17.  However, the petitioners did not file any evidence to suggest that the government was fraudulently concealing the connection between vaccines and autism.  Furthermore, petitioners failed to show how respondent's alleged concealment prevented them from filing a petition on behalf of W.J.  At the time W.J. was vaccinated and later diagnosed with autism the Vaccine Program was conducting an Omnibus Autism Proceeding ("OAP"), which included more than 5,100 petitions filed under the Vaccine Act alleging that vaccines caused autism.  See Snyder v. Sec'y of Health & Hum. Servs., No. 01-162V, 2009 WL 332044, at *4 n.12 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 88 Fed. Cl. 706 (2009).  Petitioners could have filed a petition during that timeframe, but did not do so.

Petitioners also cite Paluck, 786 F.3d 1373 to emphasize that "that vaccines do sometimes cause or enhance autism-like symptoms."  Petition at 16.  The Court in Paluck held that the parents of K.P. demonstrated "by preponderance of evidence that their son's existing mitochondrial disorder was significantly aggravated by his receipt of vaccines within medically acceptable time, and thus he was entitled to compensation under National Childhood Vaccine Injury Act."  786 F.3d at 1373.  K.P. demonstrated significant developmental delays when he was nine months old and underwent evaluations that showed he had gross motor delays.  Id. at 1375.  K.P. received an MMR vaccine and pneumococcal vaccines at his one-year well baby visit, and two days later had a high temperature.  Id. at 1376.  After a series of tests and a three weeklong hospitalization, K.P. was subsequently diagnosed with an unspecified mitochondrial disorder "most likely present from the time of K.P.'s birth."  Id.  The petitioners in Paluck

showed by preponderant evidence, the first sign of neurodegeneration was within 23 days of vaccines, and the findings of his pediatrician, neurologist, and speech therapist, as well as MRI exams, showed K.P.'s rapid, progressive neurodegeneration as predicted by his expert's medical theory. Id. at 1379.

Here, petitioners did not show W.J. has a mitochondrial disorder. W.J. was assessed with speech delay over a year after the MMR vaccine at issue was administered and was diagnosed with autism two years later. Petitioners failed to provide any evidence linking W.J.'s speech delay or autism diagnosis to the MMR vaccination, how the government contributed to obstructing petitioner's ability to file a petition on behalf of W.J., or how W.J.'s condition is similar to that of K.P.'s in Paluck. Additionally, the Paluck case did not involve the issues of the statute of limitations or equitable tolling.

Petitioners have the burden of establishing the timely filing of their claim, and they have failed to provide evidence that their petition was filed within "36 months after the date of occurrence of the first symptom or manifestation of onset . . . of such injury" as required by the Vaccine Act. Because petitioners have alleged injury onset in 2006 (diagnosis of speech delay), and at the latest, 2012 (eczema and allergies), the undersigned, in assessing all inferences from the available evidence in petitioner's favor, finds it appropriate to dismiss the case for failure to establish that the petition was timely filed.

### 5.     Petitioner's Autism Diagnosis

In the OAP, three special masters conducted separate proceedings in test cases involving the two theories of autism causation. All found petitioners had not provided preponderant evidence of causation. See Hazlehurst v. Sec'y of Health & Hum. Servs., No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd sub nom. Hazlehurst ex rel. Hazlehurst v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 473 (2009), aff'd sub nom. Hazlehurst v. Sec'y of Health & Hum. Servs., 604 F.3d 1343 (Fed. Cir. 2010); Cedillo v. Sec'y of Health & Hum. Servs., No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 89 Fed. Cl. 158 (2009), aff'd, 617 F.3d 1328 (Fed. Cir. 2010); Mead ex rel. Mead v. Sec'y of Health & Hum. Servs., No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); King ex rel. King v. Sec'y of Health & Hum. Servs., No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); Dwyer ex rel. Dwyer v. Sec'y of Health & Hum. Servs., No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); Snyder, 2009 WL 332044.

Here, petitioners state, "[b]ased on his symptoms and behaviors, [W.J.] was diagnosed by his physician as having autism. . . . Indeed, [W.J.] does have several autism-like symptoms." Petition at 15. Petitioners assert respondent's denial "of any connection between vaccines and autism can be misleading because they serve to obscure any connection between vaccines and injuries resulting in autism-like symptoms, if not autism proper, in children." Id. at 16. "Since the cause of autism is unknown, the postulation that vaccines may sometimes cause autism-like symptoms, rather than autism proper in children, cannot be ruled out." Id.

Petitioners further state respondent's "categorical denials have the effect of misleading and discouraging parents with children who have autism-like symptoms from even thinking that

the symptoms might have been caused by a vaccine." Petition at 16. Petitioners argue that "[r]espondent's assertions that hard science has ruled out any connection between vaccines and autism-like symptoms can amount to a 'fraudulent defense' to any claims suggesting otherwise, warranting equitable tolling in some cases. Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946)."[14] Id.

> Equity will not lend itself to such fraud and historically has relieved from it. It bars a defendant from setting up such a fraudulent defense, as it interposes against other forms of fraud. And so this Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.

> This equitable doctrine is read into every federal statute of limitation. Holmberg v. Armbrecht, 327 U.S. 392, 396-397 (1946) (Internal citations and quotation marks omitted).

Petition at 17.

Petitioners then assert that after genetic testing, a chromosomal aberration, Xq28 duplication, was discovered. Petition at 17. Petitioners believe the Xq28 duplication impaired [W.J.'s] immune system and caused his mental incapacities, and he "might not be autistic at all or that the Xq28 duplication is a cause of his autism." Id. Finally, petitioners state, "because of the Xq28 duplication, the MMR vaccine should not have been administered to [W.J.] at all, and that it probably significantly aggravated his congenital chromosomal aberration." Id. at 18.

Petitioners, however, do not provide any evidence to support their contentions that respondent's actions prevented them from filing a timely claim in the thirty-six months after W.J. first began to show signs of autistic spectrum disorder or how the fraudulent defense pertains to this case. Around the time of W.J.'s vaccination and autism diagnosis, more than 5,100 petitions were filed under the Vaccine Act alleging that vaccines caused autism. See Snyder, 2009 WL 332044 at *4 n.12.

There is no evidence here to suggest that fraud or concealment prevented petitioners from timely filing claims on behalf of W.J. for allegations of autism following vaccination. Thus, the undersigned does not agree that respondent's "categorical denials" had the "effect of misleading and discouraging parents with children who have autism-like symptoms" from filing petitions, or that this claim warrants "equitable tolling" based on any assertion of fraud. Petition at 16.

---

[14] Petitioners cite Holmberg v. Armbrecht, an equity case where shareholders and creditors of the Southern Minnesota Joint Stock Land Bank of Minneapolis sued the defendant for fraudulently concealing his shareholder interest, which delayed petitioners from bringing suit. 327 U.S. 392, 393 (1946).

Therefore, in assessing all inferences from the available evidence in petitioner's favor, petitioners have failed to show respondent's actions prevented them from filing a timely petition.

**6.      Petitioner's Fourteenth Amendment Claim**

Petitioners contend, "[t]o consider equitable tolling for K.G.'s drug and alcohol induced mental incapacity, but not for [W.J.'s] congenital genetically-caused mental incapacity, would be disability discrimination in violation of [W.J.'s] Fourteenth Amendment rights."  Petition at 18. Petitioners cite City of Cleburne, 473 U.S. 432, stating disparate treatment between neuro-normal and mentally incapacitated individuals violates the Fourteenth Amendment's Equal Protection clause.  Id.  "The equal protection clause of the Fourteenth Amendment dictates that [W.J.] receive the same consideration for equitable tolling that was offered to K.G."  Id. at 19. But petitioners fail to comprehend that they, as parents and legal representatives of W.J., had the right and responsibility to timely file a petition.  They have not asserted that they have any disability or mental incapacity.  Thus, their argument based on the Fourteenth Amendment fails.

Further, under the Vaccine Program, the Vaccine Act's limitation period is rationally related to the dual legitimate legislative purposes undergirding the Vaccine Act: (1) the settling of claims quickly and easily, and (2) the protecting of manufacturers from uncertain liability making "production of vaccines economically unattractive, potentially discouraging vaccine manufacturers from remaining in the market."  See Cloer, 85 Fed. Cl. 141 (2008) (quoting Brice, 240 F.3d at 1368).

Highlighting in Cloer that the "neutral" nature of the 36-month statute of limitations "treats all petitioners equally," the Federal Circuit appears to have affirmed, without overt discussion, the Court of Federal Claims' use of rational basis review to conclude that the statutorily prescribed limitations period is rationally related to the "legitimate legislative purposes undergirding the Vaccine Act."  Cloer, 85 Fed. Cl. at 151-52 (quoting Brice, 240 F.3d at 1368).  See id. ("[T]here can be no question that applying the Vaccine Act's limitation period is rationally related to the dual legitimate legislative purposes undergirding the Vaccine Act: (1) the settling of claims quickly and easily, and (2) the protecting of manufacturers from uncertain liability [that makes the] 'production of vaccines economically unattractive, [and] potentially discourag[es] vaccine manufacturers from remaining in the market.'") (internal footnote omitted).  The Court of Federal Claims further stated in Cloer that "Congress is not obligated to extend the coverage of the Vaccine Act . . . to all person[s] suffering a vaccine-related injury." Id. at 150 (citing Leuz v. Sec'y of Health & Hum. Servs., 63 Fed. Cl. 602, 608 (2005)).

The petitioners have not shown that they fall within a protected class of persons.  The claims of all petitioners, regardless of the alleged injury, must be evaluated consistent with the terms of the Vaccine Act, provided the claimants have met the threshold requirement of filing the petition within the time limit prescribed by the statute.  Here, petitioners have failed to file within the appropriate time frames set forth under the statute.

**VII      CONCLUSION**

It is clear from the medical records that W.J. has struggled with illness, and the

undersigned has great sympathy for what he and his parents have endured due to his illness.  The undersigned's decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

Accordingly, for all the reasons stated above, in assessing all inferences from the available evidence in petitioner's favor, the undersigned **GRANTS** respondent's motion to dismiss and this case is dismissed for failure to timely file the petition within the statute of limitations.  In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master